Good morning, Your Honors, and may it please the Court. My name is Jessica Perlich, appearing on behalf of Respondents' Appellants in this matter. With the Court's permission, I'd like to reserve two minutes for rebuttal. When a claim is subject to the highly deferential standard of review mandated by 2254D, the only question that matters is whether the State Court's decision is so obviously wrong so as to be beyond the possibility for fair-minded disagreement. In this case, the District Court, rather than considering the reasonableness of the Nevada Supreme Court's decision to affirm the denial of habeas relief to Ricardo Lopez, simply supplanted the State Court's decision and reasoning with its own. The U.S. Supreme Court recently reminded us in Shinbi C.A.R. that whether some jurists might agree with the District Court's decision is not the standard of review and not the issue. The question and the relevant standard is whether a fair-minded jurist could take a different view. Here, fair-minded jurists could certainly disagree on whether presentation of Dr. Paglini's report during the penalty hearing for Ricardo Lopez would have been beneficial or harmful in light of the information it contained. Reversal is warranted in this case because the District Court engaged in exactly the type of analysis that the U.S. Supreme Court has warned against. It was not objectively unreasonable to screen from the jury's consideration a report containing substantial detrimental harmful information, nor was there a reasonable probability of a different outcome had the report or Dr. Paglini been presented to the jury. The Nevada Supreme Court's decision really focused on the family history and concluded that it would have been duplicative had the expert been called. But there is, in the expert report, information on psychological research that bears on this particular petitioner's issues and rehabilitation prospects. Why doesn't that information present a qualitative difference that's significant that the Nevada Supreme Court completely failed to address? Well, Your Honor, there is additional information contained in Dr. Paglini's psychological assessment that also impacts the Nevada Supreme Court's decision or supports it. It's the fact that Dr. Paglini, while discussing the family history and the bases for his potential violence and risk of violence in the future, also says that he has an intense rage towards society. He was the product of a broken and difficult childhood, but he would need to adjust to prison and incarceration in order for his risk of being violent in the future to decrease to the extent the district court believes was necessary for the jury to hear. The Nevada Supreme Court looked at what Dr. Paglini included with the assessment of the childhood, the abuse, the drug use, and also reviewed what Eduardo Rosas, Mr. Lopez's uncle, testified to in front of the jury. And Mr. Rosas included much of the information that was included in Dr. Paglini's report. To some extent, it was duplicative, but... And so I think the conclusion that it's cumulative, I think reasonable minds can differ as to whether that cumulative ruling is really correct. I'm really now focusing on the portions of the expert's report that the uncle did not testify to and could not have testified to. And that really is information on the research that impacts somebody's behavior. So that's really an expert opinion that the uncle didn't get to. And also references to research on brain development, because this position was very young when the crime was committed and the brain is still developing up until the age of 25. I didn't see any mention of that in the state court's ruling. So my question to you is that doesn't that present a qualitative difference? No, Your Honor. Although it does provide some context for Mr. Lopez's behavior and criminal history, I believe it doesn't undermine the ultimate conclusion. And while it was information that was not testified to, I believe Dr. Paglini's report was sort of the quintessential example of a double-edged sword. It provided extensive information regarding a psychological assessment in history, but it also provided an opportunity for very damaging cross-examination if Dr. Paglini had appeared to testify. It ultimately would have resulted in somewhat of Mr. Lopez testifying against himself through Dr. Paglini. There was such a substantial amount of information of uncharged violent offenses that Dr. Paglini looked to in discussing what psychological factors impacted Mr. Lopez and the actions he took later throughout his life. That I believe even though that information was not presented to the jury, it was not objectively unreasonable to screen the jury from that information. And to that end, Your Honor, when looking at the report, there are additional considerations that I believe support reversal in this matter. One of the pieces of information that Mr. Lopez gives to Dr. Paglini is a statement that his uncle, the very person who testified in support of him, beat him after one of the incidents. So with counsel bringing in, and that was at the record in 1856, with counsel bringing in the uncle to somewhat humanize Mr. Lopez and provide a human view of him and his troubled childhood and history, that ran the risk of undermining the ultimate goal of what the penalty hearing was supposed to be about. Additionally, Dr. Paglini included some information about believing that this crime was not premeditated, which flew in direct contradiction to what the jury ultimately decided. And so that also ran the risk of bringing in an expert whose opinion contradicted the jury's already reasoned decision. And so to a large extent, this report could have done just as much harm as it could good. And I believe the problem here is that we need to look at this through the highly deferential review mandated by 2254. This was not so beyond the possibility of fair-minded disagreement for the Nevada Supreme Court to review Dr. Paglini's report, consider what was already testified to and what was already presented at trial, and conclude that there was no reasonable probability of a different outcome had it been presented. And that is why reversal is warranted here. And with the court's permission, I'd like to reserve the rest of my time for rebuttal. Thank you, counsel. Mr. Quarles. Thank you, Your Honor. Good morning. May it please the court. My name is Thomas Quarles. I'm counsel for Ricardo Jose Lopez, the petitioner, Apolli, in this case. And we basically have two things to talk about that the court has already expressed interest in. One of them is, of course, what was the deference that was due to the state court's decisions? And the second one is, what is the essential nature, what is the importance of expert mitigation evidence in the penalty phase of a first-degree murder trial? It's Mr. Lopez's position that the district court, Chief Judge Ju, gave the state court's more than adequate deference, and that there are at least three, maybe four, ways for this court to affirm that decision. The first two are under ADEPA. In Section 2254 D.1, the court could affirm because the state court's interpretation and application of Strickland in this case was objectively unreasonable. Or under 2254 D.2, because the state court's findings are objectively unreasonable in that they are either belied by the record or simply nonexistent. Additionally, as I briefed, because the state court did not hold an evidentiary hearing in this matter, this court has held numerous times that the findings of fact are not, that the state court are not entitled to those ADEPA deferences. There's a possible fourth route in which this court identifies something that Judge Ju did not. They may still affirm that decision based upon different rationale and different grounds. The basic facts are that trial counsel was handed a mental health expert who did an extensive workup in preparation. They tried to get it on in the trial phase, but also for the purposes of mitigation expressly, that evidence was available, and trial counsel simply didn't even put the expert on the notice list and didn't call him. So, and then the state court, the other facts of the state court just completely dropped the ball with its failure to hold an evidentiary hearing and with its mistaking the essential facts regarding the report and its value. Can you address counsel's point that this is a report or calling this expert would have presented a double edged sword? There's pretty substantial aggravating evidence that would have come out as well. Sure. Thank you. My position on that, Luca's position on that, is that there's a different, number one, the uncle had put out a lot of this bad information. The other is that there was a lot of, this bill had been wrong. There was a lot of negative information already out there about him, his crimes, his terrible upbringing. The thing that, a number of ways that the uncle can't do, that the expert can do, is create a causal connection there and speak, as you mentioned, to the research, which was, which is out regarding, Mr. A plethora of medical and psychiatric evidence that the frontal lobe, the impulse control is not fully developed in many people until age of 25. And so one of the things that the report did was it, it made a causal link between his terrible, violent, neglected, neglectful upbringing and the crime at issue, but also took it and said, here's the thing. This is no surprise that this happened now, but as his brain develops, and the research shows that by the time he's 60 years old, his propensity for violence goes way, way down. And so that was, that's a critical thing that the future dangerousness piece of this is critical. It's critical because there's no strategic reason not to put on that evidence that he will become less violent in the future when the only choice the jury has to make is between life with parole or life without parole. There's simply no reasonable strategy in not putting that information on. And, and then the other piece of that is that the, the state courts fundamentally missed that. They misread that and it continues to be misstated that Dr. Paglini said the statement about his hatred towards society or his, or his violent nature was about what brought him to this point. It was explaining how this happened. And it was also in the context of this was an impulsive act. This wasn't something that he, you know, plotted and planned. And so that's critically important in that when he's 60 years old, is he going to be a danger to society? And that's the critical thing that Dr. Paglini could have said and that the state court fundamentally missed. They said that Dr. Paglini was going to say that his future propensity for violence was extremely high. That's simply not true. That's not what the report said. And obviously the expert could have explained that in more detail on the stand. So again, I see that my time is running low. So to put it in the no fair-minded jurist language, even, you know, my position, Lopez's position is still that the lack of evidentiary hearing takes away the necessity for that language. But we need that anyway, because no fair-minded jurist could disagree that. What in your view was going to happen at an evidentiary hearing? So if the state had held an evidentiary hearing, what evidence would have been disclosed that would have made a difference? Thank you. That's a great question. Well, first of all, we could have asked the trial lawyer the reasons for the omission, because you have the state court just making up that this was a strategic decision without any evidence to base that on. And certainly a reasonable reading of the report would not say that that was a strategic reason. So first of all, we could have heard from trial counsel. But secondly, we could have had, again, the expert to elaborate upon the testimony that would have been given at trial. And I think the omission of those has made the job harder for all of us since then. But in reality, the expert report was in there. And nobody disputed that. The state didn't dispute it. So they took it on face value. So do you know what else the expert would have testified to that would not be in the report? We don't, unfortunately, have that in the record. That's just, again, sort of based upon my experience with experts. But also, again, I think it's critical that we don't have any testimony from trial counsel. And I would say that under the ADEPA thing, no fair-minded jurist could disagree that common sense, which is what the state court relied upon, that the experts report was just common sense. So common sense cannot be the substitute for the opinion of an experienced mental health professional. I think no fair-minded jurist could disagree about that. No fair-minded jurist could disagree that it was not a choice, as the state court seems to indicate, between putting on an uncle and putting on Dr. Paglini. They both have different purposes, one sort of more humanizing and the other one speaking to the medical research, speaking to the lack of future dangerousness when he's 60 years old. I would say that no fair-minded jurist could disagree that Paglini's negation of future dangerousness would not be essential in a penalty phase of a first-degree murder case. And no fair-minded jurist could disagree that the fundamental factual errors the state court made regarding what was in the expert's opinion on future dangerousness are not entitled to deference. I'd like to distinguish the Kher case just briefly in that there was a nine-day evidentiary hearing in Kher. Kher's crime was extremely well-planned with, quote, control and intentionality, and he purposely interfered with his trial lawyer's preparation of mitigation. None of that is in Lopez. Thank you, counsel. We'll hear from Bonham. Just briefly, Your Honors. Regarding Dr. Paglini's conclusions regarding the risk of future violence, I think it's important to look at his report and the exact language he couches his conclusions in. At 1863, he says, from a risk perspective, if Mr. Lopez were released at 61 and also exhibited an adequate adjustment to incarceration, that is how he concludes that the risk of violence would substantially decrease over time. And it's that language that I would point Your Honors to in finding that there was no reasonable probability of a different outcome. The jury had heard from the probation officer that Mr. Lopez was involved in a prison riot when he was at a juvenile facility and that he was one of the ringleaders. So in addition to that, which the jury also already knew, this report contained a multitude of admissions to uncharged acts that he committed while in prison. Those included shanking another inmate, an act for which he was never found. It included gang banging, and he admitted to acting as a soldier in the prison gangs. Dr. Paglini states that he has to adjust to prison. This report and the presentation thereof ran the risk of exacerbating what the district court looked at as the information the jury already had. They had already concluded he was violent. Therefore, what was there to lose? And respectfully, that is only an appropriate conclusion when looking at this in the context of hindsight. With hindsight, we can say, yes, he had nothing to lose because he ultimately got life without parole. But in the context of the trial at the time, it was not objectively unreasonable to prevent the jury from affirming the conclusions they already had about this defendant. So your honors, we respectfully request that you reverse the district court's decision. Thank you both for your arguments today. The case just argued be submitted for decision and will proceed to the next case on the oral argument calendar, which is Alaska's Martinez versus Wilkinson.
judges: Thomas, Ikuta, Nguyen